**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **RACHEL DRIVER**, on behalf of herself and all others similarly situated,<br><br>　　　　　Plaintiff,<br>v.<br><br>**BAYPORT CREDIT UNION,**<br><br>　　　　　Defendant. | Case No. _____ |

## CLASS ACTION COMPLAINT

Plaintiff Rachel Driver ("Plaintiff"), on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding herself and on information and belief as to others.

## INTRODUCTION

1.　　Plaintiff brings this action on behalf of herself and a class of all others similarly situated against Defendant BayPort Credit Union ("BayPort") over the improper assessment and collection of $5, $20, $25, and $29 Overdraft Item Charges or NSF Fees (collectively, "Overdraft Fees"), including fees on accounts that were never actually overdrawn, practices that are in breach of BayPort's contracts and its duty of good faith and fair dealing.

2.　　BayPort charges accountholders $5, $20, $25, or $29 per Overdraft Fee on accounts that were never actually overdrawn.

3.　　Through the imposition of these fees, BayPort has made substantial revenue to the tune of millions of dollars, seeking to turn its customers' financial struggles into revenue. Plaintiff, like thousands of others, has fallen victim to BayPort's Overdraft Fee revenue maximization scheme.

1

4.      Plaintiff, on behalf of herself and all others similarly situated, brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure for damages and other relief arising from BayPort's routine practice of assessing Overdraft Fees on transactions that did not overdraw checking accounts.

## JURISDICTION

5.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and based upon information and belief, at least one member of the proposed Class is a citizen of a different state than Defendant.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

7.      Plaintiff Driver is a natural person who is a citizen of Virginia and resides in Hampton, Virginia.

8.      Defendant BayPort is a credit union with approximately $1.6 billion in assets. Defendant has more than 20 locations throughout Virginia. Its headquarters are in Newport News, Virginia, making it a Virginia citizen.

## I.      BAYPORT ASSESSES OVERDRAFT FEES ON TRANSACTIONS THAT DO NOT OVERDRAW THE ACCOUNT

9.      Plaintiff has a personal checking account with BayPort, which is governed by BayPort's "Important Account Information for Our Members," attached as Exhibit A ("Account Agreement"), Pricing Schedule for Products and Services,

attached as Exhibit B ("Fee Schedule"), and Opt-In Form, attached as Exhibit C ("Overdraft Form") (collectively, the "Account Documents").

10.    BayPort issues debit cards to its checking account customers, including Plaintiff, which allow customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

11.    Pursuant to its Account Documents, BayPort charges fees (currently in the amount of $5, $20, $25, or $29 per Overdraft Fee) for debit card transactions that overdraw an account.

12.    Plaintiff's checking account with BayPort was at all relevant times governed by BayPort's Account Documents, which are standardized form contracts for deposit accounts, the material terms of which are drafted by BayPort, amended by BayPort from time to time at its convenience and complete discretion, and imposed by BayPort on all of its deposit account customers.

13.    The Account Agreement states: "You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. . . . You agree that we may charge fees for overdrafts" Ex. A at 4.

14.    According to the Overdraft Form:

An underdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

Ex. C.

15.    The meaning of key terms such as "honor," "enough money," and "to cover" are not defined or explained.

16.    In breach of these promises, BayPort assesses Overdraft Fees on transactions that do *not* overdraw the account.

## A. **Plaintiff's Transaction**

17.     On January 5, 2020, BayPort charged Plaintiff a $20 Overdraft Fee on an ATM Withdrawal for $20.00.

18.     According to BayPort's own statements, Plaintiff had nearly $100 in her account after this transaction posted. Plaintiff therefore had "enough money in [the] account to cover" this transaction.

19.     BayPort improperly assessed Plaintiff an Overdraft Fee on this transaction anyway.

20.     Because Plaintiff had "enough money in [the] account to cover" this transaction, under the terms of the Account Documents, it did not overdraw her account and could not incur an Overdraft Fee.

21.     BayPort thus breached its Account Documents by charging an Overdraft Fee on these transactions.

## II.     **BAYPORT ALSO ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE PREVIOUSLY AUTHORIZED ON SUFFICIENT FUNDS**

### A. **Overview of the Claim**

22.      Plaintiff brings this action challenging BayPort's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

23.     Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, BayPort immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have

sufficient funds available to cover these transactions because BayPort has already sequestered the funds for payment.

24. However, BayPort still assesses crippling $5, $20, $25, and $29 Overdraft Fees on many of these transactions and mispresents its practices in its Account Documents.

25. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, BayPort later assesses Overdraft Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

26. BayPort maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, BayPort sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

27. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

28. That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to

account for pending debit card transactions. Therefore, many subsequent transactions incur Overdraft Fees due to the unavailability of the funds sequestered for earlier debit card transactions.

29.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, BayPort improperly charges Overdraft Fees on APSN Transactions.

30.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

31.     There is no justification for these practices, other than to maximize BayPort's Overdraft Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But BayPort is free to protect its interests and either reject those intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But BayPort was not content with these millions in Overdraft Fees. Instead, it sought millions more in Overdraft Fees on APSN Transactions.

32.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in BayPort's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of BayPort's processes and practices. BayPort also exploits its contractual discretion by implementing these practices to gouge its customers.

33.     In plain, clear, and simple language, the Account Documents promise that BayPort will only charge Overdraft Fees on transactions if there are insufficient funds in the account to cover those transactions

34.     BayPort is not authorized by contract to charge Overdraft Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

### B.  **Mechanics of a Debit Card Transaction**

35.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from BayPort. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to BayPort, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

36.     At this step, if the transaction is approved, BayPort immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

37.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

38.     BayPort (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that BayPort may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

39.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**C.  BayPort's Account Documents and APSN Transactions**

40.     The Account Documents provide that BayPort will not charge Overdraft Fees on transactions that have sufficient funds to cover them at the time they are initiated.

41.     BayPort's Account Documents promise that BayPort will assess Overdraft Fees "when you do not have enough money in your account to cover a transaction, but we pay it anyway."

42.     BayPort's decision to "cover" or "pay" a transaction necessarily occurs at the moment of authorization.

43.     BayPort further promises that overdrafts are determined at the moment it "authorizes and pays" a debit card transaction:

What are the <u>standard overdraft practices</u> that come with my account?

We <u>do</u> **authorize and pay** overdrafts for the following types of transactions:
- Checks and other transactions made using your checking account number
- Automatic bill payments

We <u>do not</u> **authorize and pay** overdrafts for the following types of transactions unless you ask us to (see below):
- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always **authorize and pay** any type of transaction.

If we <u>do not</u> **authorize and pay** an overdraft, your transaction will be declined.
. . .

What if I want BayPort Credit Union to **authorize and pay** overdrafts on my ATM and everyday debit card transactions?

If you also want us to **authorize and pay** overdrafts on ATM and everyday debit card transactions, call . . .

\_\_\_     I <u>DO Not</u> want BayPort Credit Union to **authorize and pay** my overdrafts on my ATM and everyday debit card transactions.

\_\_\_     YES I <u>do</u> want BayPort Credit Union to **authorize and pay** overdrafts on my ATM and everyday debit card transactions.

Ex. C. (bolded emphasis added).

44.     The Overdraft Form explicitly links payment and overdrafts to authorization ***eight times***. *See id.*

45.     For APSN Transactions, for which funds are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet BayPort assesses Overdraft Fees on them anyway.

46.     The above promises indicate that transactions are only overdraft transactions when they are "authorized and paid" into a negative account balance. Of course, that is not true for APSN Transactions.

47.     BayPort charges Overdraft Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any Account Document states that BayPort may impose Overdraft Fees on any APSN Transactions.

48.     The Account Documents also misrepresent BayPort's true debit card processing and overdraft practices.

49.     First, and most fundamentally, BayPort charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover the transactions throughout their lifecycle.

50.     BayPort's practice of charging Overdraft Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between BayPort's actual practice and the Account Documents causes consumers like Plaintiff to incur more Overdraft Fees than they should.

51.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

52.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what BayPort does when it re-debits the account during a secret batch posting process.

53.     In reality, BayPort's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time of authorization and later at the time of settlement.

54.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into positive funds. As such, BayPort cannot then charge an Overdraft Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

55.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, BayPort releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

56.     This secret step allows BayPort to charge Overdraft Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which BayPort specifically set aside money to pay them.

57.     In sum, there is a huge gap between BayPort's practices as described in the Account Documents and BayPort's actual practices.

58.     Banks and credit unions like BayPort that employ this abusive practice require their accountholders to expressly agree to it—something BayPort never did.

59.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, financial institutions generally provide express warnings that APSN fees can occur, and explanations and examples of how such fees occur. These institutions therefore require their accountholders to authorize them to charge Overdraft Fees in such circumstances.

60. For example, Bank of America's deposit agreement states:

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. . . . **The amount being held is not applied to the debit card transaction**. . . . **If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant**. . . .

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

*Deposit Agreement and Disclosure*, Bank of America 18 (Nov. 1, 2019), https://www.bankofamerica.com/deposits/resources/deposit-agreements.go (emphasis added).

61. As another example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn. The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60. As a result, your available balance will be reduced by $60 so your available balance is only $40. Your actual balance is still $100. Before the restaurant's charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019), https://cdn. canvas.org/files/content/pdf/MSA_Part_2-CanvasCU-Std_Size-11-05-19.pdf (emphases in original).

62.     Capital One's deposit agreement similarly states:

Other intervening transactions that occur while authorized debit card transactions are pending may create overdrafts on your account. Here is an example of how that could happen:

You're enrolled in our optional overdraft service. Your account balance is $100.00. On Monday, you go to the store and use your debit card to make a purchase for $80.00. We authorize the transaction; however, the merchant doesn't send us the transaction for payment and posting to your account on that day. On Tuesday, you withdraw $30.00 from an ATM, reducing your account balance to $70. **On Wednesday, the merchant requests payment for the $80.00 transaction authorized on Monday, and you're charged a fee because the balance in your account is insufficient to pay the transaction at that time**.

*Rules Governing Deposit Accounts*, Capital One (Nov. 7, 2018),   https://www.capitalone.com/ bank/rules-governing/disclosures/ (emphasis added).

63.     BayPort and its accountholders make no such agreement. The Account Documents thus mislead and deceive accountholders.

### D.  <u>Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately</u>

64.     BayPort's assessment of Overdraft Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

65.     BayPort was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

66.     BayPort knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

67.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?* Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card=.

68.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Cash for Smallest Purchases*, MarketWatch (Mar. 23, 2016), http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

69.     Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

70.     BayPort was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Account Documents only support this perception.

**E.** **Plaintiff Was Assessed an Overdraft Fee on Debit Card Transactions Previously Authorized on Sufficient Funds**

71.     On November 4, 2019, Plaintiff was assessed a $5 Overdraft Fee on a $6.13 debit card transaction that settled on that same day. According to financial statements produced by Defendant, this transaction was previously authorized on sufficient funds on November 1, 2019.

72.     On December 4, 2019, Plaintiff was assessed a $5 Overdraft Fee on a $1.00 debit card transaction that settled on that same day. According to financial statements produced by Defendant, this transaction was previously authorized on sufficient funds on December 3, 2019

73.     On December 4, 2019, Plaintiff was assessed another $5 Overdraft Fee on a $1.00 debit card transaction that settled on that same day. According to financial statements produced by Defendant, this transaction was previously authorized on sufficient funds on December 3, 2019

74.     On December 5, 2019, Plaintiff was assessed a $29 Overdraft Fee on a $5.25 debit card transaction that settled on that same day. According to financial statements produced by Defendant, this transaction was previously authorized on sufficient funds on December 3, 2019.

75.     Contrary to BayPort's Account Documents, the Overdraft Fees were charged even though Plaintiff's account was not overdrawn because the account had "enough money to cover" the transactions.

76.     The improper fees charged by BayPort were also not "errors" by BayPort, but rather were intentional charges made by BayPort as part of its standard processing of transactions.

77.     Plaintiff therefore had no duty to report the fees as "errors" because they were not "errors," but were systematic and intentional fees assessed according to BayPort's standard practices.

78.     Moreover, any such reporting would have been futile as BayPort had made a decision to charge the fees in this specific manner to maximize profits at the expense of customers

### III.  THE IMPOSITION OF OVERDRAFT FEES THAT DO NOT OVERDRAW THE ACCOUNT BREACHES BAYPORT'S DUTY OF GOOD FAITH AND FAIR DEALING

79.     Parties to a contract are required not only to adhere to the express terms of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

80.     Here—in the adhesion agreements BayPort foisted on Plaintiff and its other customers—BayPort has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, BayPort abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged Overdraft Fees on transactions that do not actually overdraw the account.

81.     BayPort exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. BayPort also abuses the power it has over customers and their accounts and acts contrary to their reasonable expectations under the Account Documents. This is a breach of BayPort's implied covenant to engage in fair dealing and to act in good faith.

82.     Further, BayPort maintains complete discretion not to assess fees at all. See Ex. A at 3 ("[we] *may* charge you a fee…[if] your account lacks sufficient available funds to pay a check, preauthorized transfer or other debit activity presented for payment…") (emphasis added). Instead,

BayPort *always* charges these fees, including on transactions that do not overdraw the account. By always exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers, BayPort breaches the reasonable expectations of Plaintiff and other customers and, in doing so, violates its duty to act in good faith.

83.     It was bad faith and totally outside Plaintiff's reasonable expectations for BayPort to use its discretion in this way.

84.     When BayPort charges improper fees in this way, BayPort uses its discretion to define the meaning of key terms such as "enough money," "cover," and "pay" in an unreasonable way that violates common sense and reasonable consumers' expectations. BayPort uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more Overdraft Fees.

## CLASS ALLEGATIONS

85.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

86.     The proposed Class is defined as:

All persons who, during the applicable statute of limitations period through the date of class certification, were charged Overdraft Fees on transactions that did not overdraw an account.

87.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

88.     Excluded from the Class are BayPort, its parents, subsidiaries, affiliates, officers, directors, legal representatives, successors, and assigns, any entity in which BayPort has a controlling interest; all customers who make a timely election to be excluded; governmental

entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

89. The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identities of whom are within the exclusive knowledge of BayPort and can be ascertained only by resort to BayPort's records.

90. The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, was charged Overdraft Fees by BayPort on transactions that did not actually overdraw her checking account. The representative Plaintiff, like all members of the Class, has been damaged by BayPort's misconduct in that she has been assessed unlawful Overdraft Fees. Furthermore, the factual basis of BayPort's misconduct is common to all members of the Class and represents a common thread of deceptive and unlawful conduct resulting in injury to all members of the Class.

91. Among the questions of law and fact common to the Class are:

    a. whether BayPort imposed Overdraft Fees on debit card transactions when those transactions did not overdraw accounts;

    b. whether BayPort violated the terms of its contract through its fee practices as alleged herein;

    c. whether BayPort violated its duty of good faith and fair dealing with Plaintiff and other members of the Class by engaging in the fee practices alleged herein;

    d. the proper method or methods by which to measure damages; and

    e. the declaratory and injunctive relief to which Class members are entitled.

92. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation no Class member could afford to seek legal redress

individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and BayPort's misconduct will proceed without remedy.

93.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

94.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

95.     Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Class, is at risk of additional Overdraft Fees on transactions that did not overdraw an account. Plaintiff and the Class are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain BayPort from continuing to commit its illegal actions.

**CAUSE OF ACTION**
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

96.     Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

97.     Plaintiff and BayPort have contracted for bank account deposit services as embodied in BayPort's Account Documents. Exs. A-C.

98.     All contracts entered by Plaintiff and the Class are identical or substantively identical because BayPort's form contracts were used uniformly.

99.     BayPort has breached the express terms of its own agreements as described herein.

100.    Under Virginia law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

101.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

102.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

103.    BayPort abused the discretion it granted to itself when it charged Overdraft Fees on transactions that did not overdraw an account

104.    BayPort also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

105.    In these and other ways, BayPort violated its duty of good faith and fair dealing.

106.    BayPort willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Class.

107.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.

108.    Plaintiff and members of the Class have sustained damages as a result of BayPort's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

109.    Plaintiff and the members of the class are entitled to injunctive relief to prevent BayPort from continuing to engage in the foregoing conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order:

a.      certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class counsel;

b.      declaring BayPort's Overdraft Fee policies and practices alleged in this Complaint to be wrongful and unconscionable;

c.      enjoining BayPort from engaging in the practices outlined herein;

d.      awarding Plaintiff and the Class restitution in an amount to be proven at trial;

e.      awarding actual damages in an amount according to proof;

f.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g.     awarding costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees and costs pursuant to applicable law; and

h.     awarding such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Dated: June 18, 2020                     Respectfully submitted,


                                         /s/Patrick Fennell
                                         Patrick Fennell
                                         **PATRICK FENNELL, ATTORNEY AT LAW, P.C.**
                                         Post Office Box 12325
                                         Roanoke, Virginia 24024
                                         Telephone: (540) 339-3889
                                         Facsimile: (540) 339-3880
                                         patrick@fmtrials.com

                                         Lynn A. Toops *
                                         **COHEN & MALAD, LLP**
                                         One Indiana Square, Suite 1400
                                         Indianapolis, Indiana 46204
                                         Telephone: (317) 636-6481
                                         ltoops@cohenandmalad.com

                                         J. Gerard Stranch, IV *
                                         Martin F. Schubert *
                                         **BRANSTETTER, STRANCH & JENNINGS, PLLC**
                                         223 Rosa L. Parks Avenue, Suite 200
                                         Nashville, Tennessee 37203
                                         Telephone: (615) 254-8801
                                         gerards@bsjfirm.com
                                         martys@bsjfirm.com

                                         Christopher D. Jennings *
                                         **JOHNSON FIRM**
                                         610 President Clinton Avenue, Suite 300
                                         Little Rock, Arkansas 72201
                                         Telephone: (501) 372-1300
                                         chris@yourattorney.com

                                         * *Pro Hac Vice* applications to be submitted

22