**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | |
|---|---|
| RACHEL DRIVER, on behalf of herself and all others similarly situated,       ) ) ) | |
| Plaintiff,     ) | Case No. 4:20-cv-00090 |
| ) | |
| v.     ) | |
| ) | |
| BAYPORT CREDIT UNION,     ) | |
| ) | |
| Defendant.     ) | |
| _____ ) | |

**DEFENDANT BAYPORT CREDIT UNION'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Defendant, BayPort Credit Union ("BayPort"), by its counsel Williams Mullen and

Litchfield Cavo LLP, and pursuant to Federal Rules of Civil Procedure 12(b)(6), submits this

Memorandum in support of its Motion to Dismiss Plaintiff Rachel Driver's Amended Complaint.

## INTRODUCTION

Plaintiff's Complaint still fails to state a cause of action against BayPort. As explained

below, BayPort clearly and unambiguously disclosed to its members when they would incur the

two fees Plaintiff complains of. Accordingly, all of Plaintiff's claims should be dismissed with

*prejudice.*

***First***, Plaintiff has not—and cannot—assert any facts to support her position that BayPort

improperly assesses overdraft fees "on accounts that were never actually overdrawn." Even though

Plaintiff's allegations regarding her first theory of liability are vague and conclusory, Plaintiff

purports to challenge the longstanding banking practice of using the "available balance" rather

than Plaintiff's preferred actual account balance method, which fails to account for transactions

that Plaintiff has made but that have not yet cleared. She does not allege using the available balance

is illegal (because it is not). Rather, she contends that BayPort breached its contract with its members because the Agreement supposedly requires the credit union to use what she calls the ledger balance method to assess overdraft fees. Plaintiff's interpretation ignores the operative contractual language of the account documents. Indeed, BayPort consistently uses plain English terms like "available" and "available funds" throughout its account documents. These terms cannot plausibly be interpreted to require BayPort to use the "ledger" balance as opposed to what it has used and disclosed to its members for decades: the available balance.

**Second**, Plaintiff's contract claim fails because her invented "APSN" theory of liability directly contradicts the plain and unambiguous language in the operative contract. Plaintiff alleges that BayPort purportedly promised to not assess an overdraft fee if her account balance was positive at the time a merchant first sought authorization of a debit card transaction. Plaintiff fails to cite any language in the contract embodying such an alleged promise. To the contrary, the contract clearly disclosed in plain terms that BayPort could assess an overdraft fee if the account balance was negative at the time the merchant later presented the transaction for payment.

Plaintiff's claim under Regulation E of the Electronic Fund Transfer Act ("EFTA") fails for the same reasons. BayPort complied with EFTA's requirements and more importantly, the claim is barred by the applicable safe harbor provision. Accordingly, and as set forth more fully below, the Court should grant this Motion and dismiss the Amended Complaint with prejudice.

## FACTUAL BACKGROUND

### I.   BAYPORT CREDIT UNION, ITS MEMBERSHIP, AND ITS MEMBERS

By statutory definition, BayPort is a member-owned, not-for-profit credit union which provides financial services to its members. Unlike banks, "Credit unions are nonprofit cooperatives, owned by their members and democratically controlled, that may only lend and pay

dividends to their members and, as such, are disinclined by their nature and structure to engage in the kinds of practices regarded as predatory or abusive." NCUA Opinion Letter 04-0147, National Credit Union Administration, at 3 (Feb. 10, 2004), available at: https://www.ncua.gov/regulation-supervision/legal-opinions/2004/preemption-new-mexico-home-loan-protection-act; *see also Whittington v. Mobiloil Federal Credit Union*, 2017 WL 6988193, *7 (E.D. Tex. 2017), *aff'd* 780 Fed.Appx. 171 (5th Cir. 2019); Fed.Reg. 46552-01 ("Unlike other financial institutions, credit unions are controlled by their membership").

## II.     THE APPLICABLE CONTRACT DOCUMENTS

Plaintiff has a checking account with BayPort, which allows Plaintiff the ability to attempt electronic debit transactions and to use a debit card. Am. Compl. ¶¶ 9-10. Plaintiff expressly admits in her Complaint that her checking account is governed by the BayPort Agreement. *Id.* at ¶¶ 9, 12. In fact, there are at least three contract documents that apply here: BayPort's Important Account Information for Our Members (the "Agreement"), BayPort's Overdraft ATM & Debit Card Opt-In Form ("Opt-In Form"), and the Fee Schedule ("Schedule"). *Id.* at 9; *see also* Am. Compl. Ex. A-C.

### A.  BayPort's Opt-In Form

Regulation E provides that before a financial institution may "assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service," it must give consumers an opt-in form that includes, among other things, a "brief" description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed. 12 C.F.R. § 1005.17. To implement this rule, the Federal Reserve Board ("FRB") created a one-page Model Form. 12 C.F.R. § 1005; *see also* A-9 Model Consent Form for Overdraft Services,

https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20091112a3.pdf, last visited September 10, 2020.

Regulation E mandates the notice "shall be substantially similar to Model Form A-9." 12 C.F.R. § 1005.17(d). BayPort's Opt-in Form closely tracks the Model Form—it briefly describes BayPort's overdraft services, including the types of transactions for which an overdraft fee may be imposed, the dollar amount of overdraft fees charged by BayPort, the maximum number of overdraft fees that may be charged, and the consumer's right to opt into, or opt out of BayPort's payment of overdrafts for ATM transactions and every day debit card transactions. *See* Am. Compl. Ex. C.

## III.    "LEDGER" OR AVAILABLE BALANCE

Like most banks and credit unions, BayPort tracks both the "actual" or "ledger" balance and the "available" balances for each member's account. The ledger balance "factors in only settled transactions in calculating an account's balance." *Domann v. Summit Credit Union*, 2018 WL 4374076, at *1 (W.D. Wis. Sept. 13, 2018) (citation omitted). It thus reflects all deposits into a member's account, less payments that have actually been posted or fully processed. *Id.* at *1-2. The available balance is the ledger balance minus funds for "electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled," as well as "holds on deposits that have not yet cleared." *Id.* Put another way, the available balance reflects the amount of money that a member has "available" to spend at any given time.

Here is an example of how the two balances work: if Plaintiff with a $100 ledger balance swipes her debit card to buy dinner for $40, BayPort places a pre-authorization hold on the account at the request of the restaurant. The member's available balance is only $60, because the $40 she just spent is no longer "available" to use. Her ledger balance will remain $100 until the restaurant

4

charge is presented for payment by the merchant and posts to the member's account. Thus, like most banks and credit unions, BayPort uses the available balance to mitigate the risk that some members may fail to track debit-card spending by swiping a card and trying to use the same money to pay two different merchants.

Indeed, the Agreement explicitly states that BayPort's uses a member's available balance to determine overdrafts:

> Checks and withdrawal rules. We may determine the amount of **available funds** in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are **insufficient available funds.**

Am. Compl. Ex. A at 3. This limitation is echoed in BayPort's Funds Availability Policy, which states that a member may "withdraw" and "use" funds deposited into her account "[o]nce the funds are **available.**" *Id.* at 12.

## IV.    DEBIT CARD TRANSACTIONS AND OVERDRAFTS

Plaintiff's allegations relate solely to a certain type of debit card transaction, which is alternatively referred to as a "swipe" or "every day, non-recurring" debit card transaction ("swipe debit card transactions"). A swipe debit card transaction takes place in at least two steps. Am. Compl. ¶ 35. The first step occurs when a credit union member such as Plaintiff swipes their debit card to make a purchase at a merchant. The merchant's card reader transmits a request for authorization to BayPort through a network (VISA or MasterCard or some other network). *Id.* Assuming certain conditions are met, BayPort will authorize the transaction. *Id.* at ¶ 36.

As explained in the Agreement, when it authorizes a swipe debit card transaction, BayPort may put an "authorization hold" on the account for the amount of the transaction indicated by the merchant: "***A temporary debit authorization hold affects your account balance*** - On debit card

purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase." Am. Compl. Ex. A at 4. Thus, the dollar amount authorized when the debit card is swiped does not always equal the amount of the final transaction.

There are multiple examples where the amount authorized for a swipe debit card transaction may be different – either more or less – than the final dollar amount of the transaction. For instance, gas stations often request authorization before any gas is pumped so they typically request a hold for an amount well in excess of the anticipated actual gas purchase. A merchant may also request less than the ultimate amount of the transaction, such as for a purchase at a restaurant where the amount authorized does not include a tip. Or, some merchants only request authorization for $1, just to make sure the debit card is authentic.

However, the crucial point here is that the merchant does not actually get paid nor does it even request payment at the time of authorization. Am. Compl. ¶¶ 35-37. In other words, during step one, BayPort does not actually transfer any funds from the member's account to the merchant's account because the merchant has not yet "presented" the transaction to BayPort for processing actual payment.

The merchant's actual request for payment does not happen until step two, which may occur as much as three days later, when the merchant's financial institution finally requests that BayPort process the swipe debit card transaction: "This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made." Am. Compl. Ex. A at 4.

As Plaintiff acknowledges in her Amended Complaint, other intervening transactions that take place between authorization in step one and presentment for payment in step two may result

in an overdraft and an overdraft fee: "If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it." Am. Compl. Ex. A at 4.

Thus, if the member either previously spent money – such as mailing out the day before a paper check that BayPort would not be aware of at the time it authorized the subject swipe debit card transaction, or continued to use his debit card or engaged in ACH transactions after the subject swipe debit card transaction – then those transactions which are actually presented for payment or processed between authorization (step one) and presentment for payment of the subject debit card transaction (step two) may reduce the account balance such that the account no longer has sufficient funds to cover the previously authorized debit card transaction by the time the merchant presents it for payment.

The Agreement also provides in plain and ordinary terms that BayPort will determine whether a debit card transaction is subject to an overdraft fee during step two at the time the item is "presented for payment" and processed by BayPort, not at the time of authorization in step one:

> If another transaction is **presented for payment** in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be an nonsufficient funds (NSF) transaction if **we** do not **pay** it or an overdraft transaction if **we** do **pay** it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. Am. Compl. Ex. A at 4.

The Agreement further disclosed in clear and simple terms to members like Plaintiff that BayPort determined whether there was an overdraft when it processed requests for payment, not at the time of authorization of a debit card transaction. Specifically, the "Payment Order of Items" provision states that it is the **payment** of those debit items that "creates" the overdrafts and overdraft fees, not authorization:

> The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented . . . If an item is presented without sufficient funds in your account to pay it, *we* may, at our discretion, *pay* the item (*creating* an overdraft) or return the item (NSF). Am. Compl. Ex. A at 7.

Plaintiff's self-defined "APSN" theory of liability also rests on the premise that those funds placed under an "authorization hold" are "sequestered" and cannot be touched for any purpose other than payment of the subject swipe debit card transaction that BayPort authorized. Am. Compl. ¶¶ 25, 29. But Plaintiff fails to cite any provision in the Agreement establishing that those held funds are untouchable. To the contrary, the Agreement clearly and unambiguously provides that all such funds are subject to payment to BayPort if he owes it reimbursement for any overdrafts or fees:

> You agree . . . to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued . . . You also agree[] to be . . . liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft. Compl. Ex. A at 2.

## V.    PLAINTIFF'S TRANSACTIONS AND RESULTING OVERDRAFT FEES

Plaintiff's allegations regarding the specific overdraft fees assessed to her account are sparse. She alleges only that at the time she made debit card transactions on November 4, 2019, December 4, 2019, December 5, 2019, and an ATM withdrawal on January 5, 2020, she had "sufficient funds" or "enough money" to cover the transactions but was still assessed overdraft fees. Am. Compl. ¶¶ 17-20, 71-77. Based on these conclusory allegations, Plaintiff filed this Amended Complaint on September 1, 2020, alleging claims for breach of contract, including a breach of the covenant of good faith and fair dealing, and a violation of EFTA. Am. Compl. ¶¶ 96-119.

**LEGAL STANDARD**

To withstand a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim has "facial plausibility" when the plaintiff pleads "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a plaintiff's allegations are generally taken as true, neither "labels and conclusions" nor "naked assertions" devoid of "further factual enhancement" will suffice. *Id*. (citation omitted). Thus, dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

**ARGUMENT**

**I.    FEDERAL LAW PREEMPTS PLAINTIFF'S CLAIMS TO THE EXTENT THE CLAIMS ARE PREMISED ON AN ALLEGED FAILURE TO DISCLOSE**

As an initial matter, to the extent Plaintiff's Amended Complaint purports to require BayPort to make additional disclosures, or attempts to regulate the type of fees BayPort can charge and when it can do so (i.e., the method and manner of the fee practices), the claims are preempted and must be dismissed.

State law claims may be preempted by Congress "'either expressly through the statute or regulation's language or impliedly through its aim and structure.'" *Lambert v. Navy Fed. Credit Union*, No. 1:19-cv-103-LO-MSN, 2019 WL 3843064, at *2 (E.D. Va. Aug. 14, 2019) (quoting *Whittington*, 2017 WL 6988193, at *6). The relevant implementing regulations of the Truth In Savings Act ("TISA") are contained in 12 C.F.R. part 707. The TISA implementing regulations require credit unions to provide disclosures regarding "[t]he amount of any fee that may be imposed in connection with the account . . . and the conditions under which the fee may be

imposed," 12 C.F.R. § 707.4(b)(4), and expressly preempt any "[s]tate law requirements that are inconsistent with the requirements of the TISA and [its implementing regulations]." 12 C.F.R. § 707.1(d).[1]

"Consistent with the language and purpose of these regulations, it is well established that state law claims regarding a [federally insured] credit union's failure to disclose certain fee practices or any perceived unfairness in the fee practices themselves are preempted." *Lambert*, 2019 WL 3843064 at *4; *see also Gutierrez v. Wells Fargo Bank, N.A.*, 704 F. 3D 712, 725-26 (9th Cir. 2012) (finding claims alleging bank's practice of posting debit-card transactions in high-to- low order was unfair were preempted because they would "prevent[] or significantly interfer[] with a national bank's federally authorized power to choose a posting order"); *id*. at 726 ("the Unfair Competition Law cannot impose liability simply based on the bank's failure to disclose its chosen posting method"); *Whittington*, 2017 WL 6988193 at *9 (finding preempted plaintiff's "attempts to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them"); *id*. at *11 (concluding plaintiff's fraud claims were "preempted by TISA to the extent they are rooted in [credit union's] alleged failure to disclose certain information governed by TISA's disclosure requirements").

Although Plaintiff purports to assert claims for breach of contract that are not preempted, her Amended Complaint includes allegations that BayPort's practices are not adequately disclosed. *See, e.g.,* Am. Compl. ¶ 57 ("there is a huge gap between BayPort's practices as described in the [Agreement] and BayPort's actual practices"); *id*. ¶¶ 58-63 (allegations as to what Plaintiff

---

[1] Even though BayPort is not a federal credit union, the same preemption rules apply to NCUA-insured credit unions. See 12 C.F.R. § 707.1(c) (explaining TISA's disclosure regulations apply "to all credit unions whose accounts are either insured by, or eligible to be insured by, the National Credit Union Share Insurance Fund.")

believes the Agreement should say). Claims like these that are disguised as breach of contract claims are preempted. *See, e.g., Hawthorne v. Umpqua Bank*, No. 11–cv–06700–JST, 2013 WL 5781608, at *12 (N.D. Cal. Oct. 25, 2013) (dismissing good faith and fair dealing claim challenging bank's "discretion to re-order transactions"); *Mann v. TD Bank, N.A.,* No. 09–1062 (RBK/AMD), 2009 WL 3818128, at *4, *8 (D.N.J. Nov. 12, 2009) (contract based and consumer protection claims premised on bank's gift card fees preempted). Parties cannot avoid federal preemption "by recasting otherwise preempted claims as state-law contract and tort claims." *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 341 (4th Cir. 2007).

Here, Plaintiff purports to require BayPort to make additional disclosures and attempts to regulate the type of fees BayPort can charge and when it can do so (i.e., the method and manner of the fee practices). *Whittington* involved a similar challenge to a credit union's overdraft "fee assessment practices," which plaintiff claimed the credit union had "fail[ed] to disclose" and misrepresented. *See Whittington,* 2017 WL 6988193, at *8-9. Plaintiff there alleged, as Plaintiff alleges here, that the federal credit union was unlawfully charging multiple "fee[s] for the same transaction." *Id*. The court dismissed the claims as preempted under federal law to the extent the plaintiff premised those claims on a failure to make disclosures or on the types of fees the credit union charged or how it charged them. *Id*. At *7-11; *see also Lambert*, 2019 WL 3843064, at *3-5. The Court should follow *Whittington* and *Lambert* and find Plaintiff's claims to be preempted. As shown below, even assuming Plaintiff's claims are not preempted, Plaintiff still fails to state a valid claim based on any of her theories.

## II.     PLAINTIFF'S CONTRACT CLAIMS FAIL AS A MATTER OF LAW

Plaintiff's contract claim fails because her agreement with BayPort expressly allows for the overdraft fees she challenges. Indeed, the plain and unambiguous terms of the Agreement fatally undermine both of her theories of liability for a breach of contract, and therefore must be dismissed.

### A.   The Membership Agreement Plainly States that BayPort Uses the Available Balance to Assess Overdrafts

First, Plaintiff alleges that BayPort breached the Agreement by assessing overdraft fees on "transactions that do not overdraw checking accounts." Am. Compl. ¶ 16. While Plaintiff's allegations are vague and difficult to follow, she appears to be alleging that BayPort breached the agreement by using the available balance to determine overdrafts instead of the "ledger" balance— i.e., all of the money in the account, without deductions for holds on pending transactions or on deposits. That claim contradicts the plain and unambiguous language of the Agreement. Interpreting the Agreement to mean overdrafts will be determined based on the available balance as opposed to ledger balance is the only plausible interpretation that gives effect to the entire contract without contradictions. *See Foothill Capital Corp. v. E. Coast Bldg. Supply Corp.,* 259 B.R. 840, 845 (E.D. Va. 2001) ("no word or provision can be rendered meaningless when a reasonable interpretation exists that gives effect to and is consistent with all parts of the contract") (applying Virginia rules of contract interpretation); *James River Ins. Co. v. Doswell Truck Stop*, LLC, 297 Va. 304, 306, 827 S.E.2d 374, 376 (2019) ("In determining whether a term is ambiguous, a court cannot look at the term in isolation; it must look at the term in the context of the entire contract"); *Levine v. Employers Ins. Co. of Wausau*, 887 F.3d 623, 632 (4th Cir. 2018) ("Virginia courts will not read contracts to produce absurd results").

Any argument by Plaintiff that the term "available" is "ambiguous" because it is not defined lacks merit. The fact that the Agreement does not contain a glossary of all the English

words used is not determinative. There is no justification for construing the contract language to mean what Plaintiff suggests is "the actual amount of money" in an account.

The term "available" is used to modify the word "funds" several times throughout the Agreement. *See* Factual Background, Section III, *supra.* If "available balance" meant all of the funds in an account, there would be no need to use the modifier "available." *See Chambers v. NASA Fed Credit Union,* 222 F Supp 3d 1 at 11 (DDC 2016) (rejecting argument that "available" balance means "actual" balance); *see also Domann,* 2018 WL 4374076, at *6-7 ("If this term meant 'all of the funds' in the member's account, as [plaintiff] urges, then the adjective 'available' would be meaningless and unnecessary"). The only way to interpret the Agreement the way Plaintiff posits would be to ignore the word "available," violating the cardinal rule of contract interpretation.

Indeed, "available balance" is a well-established industry term that has long been understood to mean the money in an account minus holds placed on funds for uncollected deposits and pending debit transactions. *See Chambers*, 222 F. Supp. 3d at 18. The conclusion that "available" means something other than "actual" or "ledger" is not only supported by the rules of contract construction, but it is spelled out in the contract itself. In particular, BayPort's Funds Availability Policy clearly informs members that there may be a difference between the actual balance on a member's account and the amount of funds that are "available" for the member to use. *See* Am. Compl. Ex. A at 16-17.

Thus, when an account agreement "refers to 'available' funds, it must be referring to a subset of funds unencumbered by such restrictions—exactly the type of restrictions that can create a divergence between the actual and available balances in the first place." *See Chambers*, 222 F. Supp. 3d at 11. In simple terms, for there to be "available funds" in an account, there must also be

"unavailable funds" in that same account. If, as Plaintiff claims, BayPort may not consider the funds on hold when determining an overdraft, the Funds Availability Policy is rendered a nullity because the holds on deposits will have no impact on whether a member may spend the full amount without overdrawing.

Indeed, the Northern District of Illinois recently dismissed a breach of contract claim based on similar contractual language and the same theory of liability. *See Page v. Alliant Credit Union, et. al.*, No. 19-CV-5965, 2020 WL 5076690, at *4 (N.D. Ill. Aug. 26, 2020). In finding that the account agreement clearly provided for the use of the available balance, the Court explained, "the [Agreement] links the withdrawal restrictions to the member's 'sufficient available funds.'" *Id.* Moreover, in rejecting plaintiff's argument that the agreement did not explain or define the account balance method, the Court held that such an argument "ignores the language in the Funds Availability Policy ('FAP') . . . which explains a member's ability to withdraw funds based on their ***availability***. For example, the FAB explains [the credit union's] right to place 'holds' on deposits." *Id.* The same is true here.

Furthermore, the Agreement explicitly disclosed to Plaintiff that "available funds" would not include any amount which Plaintiff had already spent on prior debit card purchases. In other words, the contract explicitly disclosed that the "available balance" would be reduced by any debit card purchases:

> **A temporary debit authorization hold affects your account balance.** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase . . . the amount of funds in your account ***available*** for other transactions will be reduced by the amount of the temporary hold.

Thus, as the courts in *Chambers, Domann,* and *Alliant* found, the Agreement unambiguously provides for the use of the available balance. Because Plaintiff has failed to allege

that BayPort's method of assessing overdrafts—by using the available balance—violated the terms of the Agreement, he has not alleged and cannot allege a breach of contract. *See Chambers*, 222 F. Supp. 3d at 12-13 (dismissing claim containing similar contractual language because it unambiguously provided that the credit union will impose overdraft fees based on the available balance); *Domann*, 2018 WL 4374076, at *7-8 (same); *Alliant Credit Union*, 2020 WL 5076690, at *4 (same).

   **B.      The Membership Agreement Plainly States that BayPort Determines Overdrafts at the Time the Merchant Requests Payment, Not at Authorization**

Next, Plaintiff's self-defined "APSN" theory of breach of contract fails as a matter of law because it rests on two faulty premises. *First*, Plaintiff's assertion that BayPort purportedly promised to assess whether an overdraft occurred only at the time it authorized a debit card transaction is false and unsupported by any language in the Agreement. Indeed, her suggestion is directly contrary to the clear and plain meaning of the Agreement's express terms providing that BayPort determines whether there is an overdraft at the time the merchant requests payment (*i.e.,* presentment), not at the time of authorization.

*Second,* Plaintiff's premise underlying her invented "APSN" theory – that "held" funds are supposedly "sequestered" and cannot be touched for any other use – is likewise fatally defective. There is no language in the Agreement "sequestering" such funds. To the contrary, the Agreement unambiguously provides that those supposedly "held" funds were immediately due and owing to BayPort to the extent Plaintiff owed BayPort for any overdrafts and related fees and thus were not available later at the time the merchant requested payment.

1.     **Plaintiff's Premise That BayPort Must Determine Whether There is an Overdraft Only at the Time of Authorization is False and Directly Contrary to the Terms of the Agreement.**

As conceded in the Amended Complaint, there is no dispute here that a swipe debit card transaction involves at least two separate and distinct steps: (1) authorization; and (2) the merchant's later presentment or request for payment. There is also no dispute that the two steps may take place as much as three days apart. Most importantly, there is no dispute that other transactions taking place in the intervening period may result in the account balance being negative and thus in overdraft at the time the subject debit card transaction is finally presented for payment.

Consequently, Plaintiff's invented "APSN" theory necessarily relies on the premise that BayPort supposedly promised in the Agreement to determine whether there was an overdraft only at the time the debit card transaction was authorized in step one. However, Plaintiff's Amended Complaint fails entirely to point to any language in the Agreement supporting her theory.

To the contrary, the Agreement *repeatedly* provides in plain and ordinary terms that BayPort will determine whether a debit card transaction is subject to an overdraft fee during step two at the time the item is presented for payment by the merchant and processed by BayPort, not at the time of authorization in step one. First, the Agreement states in plain terms that BayPort determines whether it will assess an overdraft fee when a transaction is "presented for payment" in step two:

> If another transaction is ***presented for payment*** in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be an nonsufficient funds (NSF) transaction if *we* do not ***pay*** it or an overdraft transaction if *we* do ***pay*** it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy.

Am. Comp. Ex. A at 4. It is the "payment" by Bayport that results in an overdraft, not the authorization. The balance at the time of authorization is totally irrelevant to whether BayPort will assess an overdraft fee on that particular debit card transaction.

The provisions of the Agreement quoted above were clear enough, but the Agreement further disclosed in clear and simple terms to members like Plaintiff that BayPort determined whether there was an overdraft when it processed requests for payment, not at the time of authorization of a debit card transaction. Specifically, the "Payment Order of Items" provision states that it is the payment of those debit items that results in overdrafts and overdraft fees, not authorization: "The order in which check or draft items are *paid* is important if there is not enough money in your account *to pay* all of the items that are *presented*." Am. Compl. Ex. A at 7. The Agreement then emphasizes that it is the *payment* of a debit card transaction that creates an overdraft and overdraft fee, not the authorization of a debit card transaction:

> If an item is presented without sufficient funds in your account to *pay* it, we may, at our discretion, *pay* the item (creating an overdraft) or return the item for insufficient funds (NSF).

*Id*. The necessary implication is that it is BayPort's "paying" of the debit card transaction that "causes" an overdraft and will result in a fee.

This case is substantively identical to a suit filed against another credit union in Florida, *Choy v. Space Coast Credit Union*, No. 2019-CA-039839 (Fla. 18th Cir. Ct) (attached as Exhibit A). In Space Coast, the court dismissed an identical "APSN" claim because the plaintiffs "baldly assert[ed] contract promises to determine overdrafts at the time of authorization, not settlement." Exhibit A at 5. But the court found "no such specific contractual provision," and instead ruled that "it is clear that an overdraft fee is assessed when the available balance is insufficient to pay a transaction when it is presented for payment." *Id*. Moreover, the court noted that, "'Presented for payment' logically means when the transaction is actually paid or settled, not the prior authorization." *Id*. This Court should apply the same reasoning and reach the same result in this case.

Similarly, in both *Boone v. MB Fin. Bank, N.A.*, 375 F.Supp.3d 987 (N.D.Ill. 2019) and *Whittington,* 2018 WL 6582824 (E.D.Tex. Oct. 26, 2018) *aff'd* 780 Fed.Appx 171 (5th Cir. 2019), the courts considered contract terms substantially similar to those in this case. In both *Boone* and *Whittington*, the district courts ruled that the contracts "unambiguously" provided that an overdraft was determined at the time of the request for payment, not at the time of authorization. In each case, the district courts dismissed the plaintiff's "APSN" theory with prejudice. This Court too should dismiss Plaintiff's Amended Complaint with prejudice.

Lastly, Plaintiff attempts to save her claim by relying on the Opt-In Form, alleging that it "explicitly links payment and overdrafts to authorization." Am. Compl. ¶ 44. Contrary to Plaintiff's contention, there is no language anywhere in the Disclosure even remotely suggesting that "authorization" and "payment" are "simultaneous" for debit card transactions. Indeed, that the form uses the phrase "authorize and pay" demonstrates that authorization and payment are two different events, because otherwise there would be no need to use both terms. In any event, Plaintiff has already admitted in her Amended Complaint that authorization and payment are two separate and discrete events occurring at different times for swipe debit card transactions.

Furthermore, the Opt-In Form is merely the means for a credit union member to decide whether or not to opt in or out of various forms of overdraft protection. As discussed earlier, it is a form based on the model form issued by the FRB under Regulation E. The form does not purport to replace the terms in the Agreement itself defining when and how an overdraft occurs. Indeed, the form cannot be read in isolation but rather must be read in conjunction with the Agreement. *Tims v. LGE Community Credit Union*, 935 F.3d 1228, 1242 (11th Cir. 2019) (construing opt-in form and account agreement together); *Domann,* 2018 WL 4374076, at *6–7; (same); *Chambers,* 222 F. Supp. 3d at 11 (D.D.C. 2016) (same). And there is no inconsistency between the Model A-

9 form and the Agreement that would serve to create any ambiguity. To the contrary, the Agreement itself clearly and unambiguously defines exactly how and when an overdraft occurs and thus defines in plain and simple terms when there is not enough money to "cover" a transaction.

> **2.     Plaintiff's Premise That Held Funds are "Sequestered" and Cannot be Touched is False and Directly Contrary to the Terms of the Agreement.**

Plaintiff's self-defined "APSN" theory of liability is fatally defective for yet another reason: it rests on the unsupported and faulty premise that those funds placed under an "authorization hold" are "sequestered" and cannot be touched for any purpose other than payment of the subject swipe debit card transaction that BayPort authorized. Am. Compl. ¶ 26. Plaintiff fails to cite any provision in the Agreement establishing that those held funds are untouchable. Her claim for breach of contract cannot rest on her own ipse *dixit*.

Contrary to Plaintiff's contention, the Agreement clearly and unambiguously provides that all such funds are subject to payment ***to BayPort*** if she owed it reimbursement for any overdrafts or fees. First, the Agreement provides, "You agree . . . to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued." Am. Compl. Ex. A at 2. Next, and significantly, a member:

> [A]grees to be . . . liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft. Am. Compl. Ex. A at 2.

Therefore, as soon as an intervening transaction occurring in between the time of authorization of the subject swipe debit card transaction and the later request for payment by the merchant rendered her account balance negative, Plaintiff immediately owed BayPort

the full amount of that overdraft caused by the intervening transaction as well as the associated fee. To use an illustration: assume the account started out with an available balance of $120, but the authorization for the purchase of gas resulted in a hold of $80, reducing the available balance to $40. A debit card transaction of $60 for groceries resulted in an overdraft of -$20 and a fee of $29. As of the moment the $60 debit card transaction is presented for payment, the member would immediately owe reimbursement of $49 (a $20 overdraft that BayPort funded to pay the $60 debit card transaction plus a $29 fee) to BayPort. Consequently, from the $80 on "hold", only $31 is available to pay the merchant the $80 owed when the merchant (the gas station) finally requests payment.

In simple terms, an "authorized" debit card transaction may be assessed an overdraft fee if Plaintiff allows intervening transactions to render her account negative by the time that original subject debit card transaction is presented for payment. It is a simple concept: to avoid overdraft fees, Plaintiff has to avoid using more money than she has in her account. In any event, Plaintiff cannot use the supposedly sequestered funds to pay the merchant because she already "immediately" owed some or even all of that money to BayPort! Consequently, there are not enough funds available in Plaintiff's account when the subject debit card transaction is finally presented by the merchant for payment and BayPort processes that transaction in step two. Therefore, the clear and unambiguous terms of the Agreement belie Plaintiff's suggestion that the "held" funds are sequestered and untouchable and may only be used to pay the merchant for the authorized debit card transaction.

Finally, the "Payment Order of Items" provision also fatally undermines Plaintiff's sequestration theory. If, as Plaintiff contends, authorization or the imposition of a hold meant money was instantly sequestered for payment, then the payment order of items would be

20

immaterial as to whether there was enough money in an account to pay all of the presented items and would have no impact on overdraft fees. When an Agreement, such as here, makes clear that the payment order does impact the number of fees, the courts have consistently held that authorizations do not lead to the sequestration of funds. *See e.g., Boone,* 375 F. Supp. 3d at 993; *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 516 (D.N.J. 2009); *Gay v. Peoples Bank*, 2015 WL 3650090 (N.C. Super. June 10, 2015); *Parrish v. Arvest Bank*, 717 F. App'x 756, 760 (10th Cir. 2017). Accordingly, Plaintiff's invented "APSN" theory of liability fails and her breach of contract claim must be dismissed *with prejudice.*

      **C.**    **Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair Dealing Fails Because BayPort Merely Exercised its Rights Under the Agreement.**

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails because BayPort acted consistent with the Agreement. Under Virginia law, the duty of good faith and fair dealing "cannot be invoked to undercut a party's express contractual rights," nor does it "compel a party to take affirmative action not otherwise required under the contract" or "establish independent duties not otherwise agreed upon by the parties." *Monton v. Am. Servicing Co*., 2012 WL 3596519, *7 (E.D. Va. 2012) (internal citation omitted). The duty also cannot "rewrit[e] an unambiguous contract in order to create terms that do not otherwise exist." *McInnis v. BAC Home Loan Servicing, LP*, 2012 WL 383590, *8 (E.D. Va. 2012). As a result, "a party does not violate the obligation to act in good faith by 'enforcing a contractual right.'" *Albayero v. Wells Fargo Bank, N.A.*, 2011 WL 4748341, *6 (E.D. Va. 2011).

BayPort's choice to exercise its right under the Agreement thus cannot constitute a breach of the duty of good faith and fair dealing as BayPort simply exercised its contractual right to charge Plaintiff the overdraft fees. S*ee Lamber*t, 2019 WL 3843064 at *5 ("Plaintiffs' breach of the covenant of good faith and fair dealing claim must be dismissed because Navy Federal honestly

exercised its contractual right to charge Plaintiff a nonsufficient fund fee for her insurer's second request for payment."); *Chambers*, 222 F.Supp. 3d at 13 (holding that Plaintiff could not "invoke the implied covenant to require the Credit Union to do what the account and opt-in agreements do not, i.e., base overdraft fees on her actual balance").

## III.   PLAINTIFF'S EFTA CLAIM FAILS AS A MATTER OF LAW

### A.  BayPort Has Complied With the Act and its Regulation

In a last-ditch effort to save her fatally flawed breach of contract claim, Plaintiff attempts to recast her arguments as Regulation E violations by relying exclusively (and improperly) on the Opt-In Form. Plaintiff claims BayPort breached Regulation E because the Opt-In Form does not accurately describe its overdraft practice. Plaintiff's EFTA claim is predicated on the very same failed arguments she made in support of her defective contract claim: that BayPort's agreements provided for the use of the ledger balance and permitted BayPort to assess overdrafts only at the time of authorization. Plaintiff is wrong.

As explained above, when read in conjunction with the Agreement and other disclosures (as it must be), Bayport accurately described its overdraft service. *See Domann*, 2018 WL 4374076 at *4-5 (construing opt-in form, funds availability disclosure, and account agreement together). As explained above, the "enough money" language of the Opt-in Form must be construed in conjunction with all of the applicable provisions in the account agreement and thus must mean the "available balance" method set forth in the Agreement. *See, e.g.,* Chambers, 222 F. Supp. 3d at 10-11 (interpreting similar opt-in form and holding that because "enough money" refers to the available balance method, the credit union cannot be said to have inaccurately described its overdraft program); *Domann*, 2018 WL 4374076 at *7-8 (same).

Likewise, when read together, the Agreement and other disclosures fatally undermine Plaintiff's invented "APSN" theory. As demonstrated in BayPort's analysis of the breach of contract claim, Plaintiff's theory is divorced from the actual language of the Agreement. To reiterate, the Agreement plainly provides that intervening transactions between authorization and presentment for payment may produce an insufficient balance to cover by time of payment. *Supra*, pp. 6-7; Am. Compl. Ex. A at 4. Further, multiple, additional provisions of the Agreement, such as the "Payment Order of Items," clearly demonstrate it is the payment of debit items that "create" overdrafts and overdraft fees, not authorization. *Supra*, p. 7-8; Am. Compl. Ex. A at 7. And, finally, yet other provisions establish that authorization of a transaction does not produce sequestration of funds to cover the transaction as presentation for payment. *Supra*, p. 19; Am. Compl. Ex. A at 2. ¶¶ 35-37.

Indeed, the Opt-In Form itself states, "An overdraft occurs when you do not have enough money in your checking account to cover [i.e., to pay] a transaction, but we pay it anyway." Thus, the Opt-In Form in conjunction with the Agreement clearly describes exactly how and when an overdraft occurs—when there is not enough money to "cover" a transaction *at the time of payment* by Bayport. Thus, Plaintiff's claim that BayPort violated Regulation E is entirely without merit.

### B. BayPort is Insulated from Liability

Moreover, BayPort is protected from liability under EFTA's safe harbor provision. That provision provides "no liability shall be imposed for 'any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board.'" 15 U.S.C. § 1693m(d)(2); *see also Tilley v. Mountain Am. Fed. Credit Union*, No. 217CV01120JNPBCW, 2018 WL 4600655, at *2 (D. Utah Sept. 25, 2018) (dismissing EFTA claim because credit union was insulated from liability by the safe harbor provision). Here, because

BayPort's Opt-In Form is based on and identical to the Model Form, BayPort cannot and should not be liable under the EFTA.

## **CONCLUSION**

For the foregoing reasons, BayPort respectfully requests that this Court grant the Motion and dismiss Plaintiff's Amended Complaint *with prejudice.*

Dated: September __, 2020

/s/ J.P. McGuire Boyd, Jr.
J.P. McGuire Boyd, Jr. (VSB No. 72753)
WILLIAMS MULLEN
P.O. Box 1320
Richmond, Virginia 23218-1320
(804) 420-6927
mboyd@williamsmullen.com

/s/ James R. Branit
James R. Branit (*Pro Hac Vice Pending*)
Keith L. Gibson (*Pro Hac Vice Pending*)
Litchfield Cavo LLP
303 West Madison Street, Suite 300
Chicago, Illinois  60606
(312) 781-6562 (Branit)
(312) 781-6647 (Gibson)
branit@litchfieldcavo.com
gibsonk@litchfieldcavo.com

*Counsel for BayPort Credit Union*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September __, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system and caused a true copy of the filing to be sent to:

Christopher Duran Jennings, Esq.
JOHNSON FIRM PLLC
610 President Clinton Ave, Ste 300
Little Rock, AR 72201
Telephone: (501) 777-7777
Email: chris@yourattorney.com
*Counsel for Plaintiff*

James Gerard Stranch, IV, Esq.
BRANSTETTER STRANCH &
JENNINGS, PLLC
223 Rosa L Parks Ave, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Email: gerards@bsjfirm.com
*Counsel for Plaintiff*

Lynn Antoinette Toops, Esq.
COHEN & MALAD LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone (317) 636-6481
Email: ltoops@cohenandmalad.com
*Counsel for Plaintiff*

Martin F. Schubert, Esq.
BRANSTETTER STRANCH &
JENNINGS, PLLC
223 Rosa L Parks Ave, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Email: martys@bsjfirm.com
*Counsel for Plaintiff*

Patrick Thomas Fennell, Esq.
PATRICK T FENNELL
ATTORNEY AT LAW PC
P.O. Box 12325
Roanoke, VA 24024
Telephone: 540-339-3889
Email: patrick@fmtrials.com
*Counsel for Plaintiff*

/s/ J.P. McGuire Boyd, Jr.
J.P. McGuire Boyd, Jr.